## WOOLSEY v. THE AMIGA MIA.

### No. 1571.

United States District Court.
E. D. Louisiana.
New Orleans Division.
April 6, 1950.

Chaffe, McCall, Toler & Phillips, Leon Sarpy, New Orleans, La., proctors for libellant.

Max M. Schaumburger, and Dudley Yoedicke, New Orleans, La., proctors for respondent.

Edwin H. Grace, Steeg & Morrison, McClendon & Wheeler, Terriberry, Young, Rault & Carroll, New Orleans, La., for intervenors.

CHRISTENBERRY, Chief Judge.

The oil yacht Amiga Mia arrived at the port of New Orleans on August 26, 1948, after a voyage which commenced at New York City on August 15, 1948. On December 2, 1948, Heathcote M. Woolsey filed his libel in rem against the Amiga Mia for foreclosure of a preferred mortgage on the vessel, Woolsey alleging that the owner of the vessel, Rose L. Martin, was indebted to him in the sum of Eighteen Thousand ($18,000.00) Dollars, as evidenced by a promissory note secured by such preferred mortgage, which note and mortgage he alleges were executed on July 22, 1948.

In due course the Amiga Mia was seized, and on motion of libellant this court ordered the interlocutory sale of the vessel, and the deposit in the registry of the Court of the proceeds of the sale. In compliance with the Court's order, the vessel was sold by the United States Marshal, libellant bidding it in for the sum of Eighteen Thousand Dollars, which sum, less the Marshal's expenses, in further compliance with the Court's order, was duly deposited.

On December 21, 1948, Alphonse Amore and Lucille B. Tosti brought their intervening libel in rem against the vessel, alleging that prior to July 23, 1948, they furnished to the Amiga Mia, on the order of Rose L. Martin, necessary supplies in the amount of $2,004.21, and that, also, prior to July 23, 1948, they advanced to Rose L. Martin on the credit of the vessel, to pay wages then due the crew and to provide necessary fuel, provisions and supplies, sums aggregating $1,660.00. They also claim that during the latter part of July, 1948, they advanced for the same purposes sums aggregating $4,800.00, and that during August, 1948, for the purpose of paying for the services of pilots for the vessel, they advanced the further sum of $559.00.

Amore and Tosti allege further that on or about August 13, 1948, before the vessel left New York, the libellant Tosti advanced the additional sum of $1,700 in payment of provisions, supplies, and crew's wages on the voyage. Amore and Tosti contend that the advances made by them subsequent to July 22, 1948, the date of the granting of the mortgage to Woolsey, were made without knowledge of the existence of such mortgage, and that if the said mortgage was granted for due consideration,—which they deny for want of information,—the mortgage is not entitled to rank as a maritime lien on the vessel, for failure to comply with certain requirements of the Ship Mortgage Act of 1920, 46 U.S.C.A. § 911 et seq. The claims of Amore and Tosti, jointly, aggregate the sum of $9,023.21, and the claim of libellant Tosti, individually, amounts to $1,700.

On December 28, 1948, Paul Walker filed his libel of intervention and interpleader against the Amiga Mia, and against Rose L. Martin, Robert Morss Lovett, Heathcote M. Woolsey, Lucille Tosti, and Alphonse Amore, individually, and jointly, severally, and in solido, as owners of the Amiga Mia. Walker's libel sets out three causes of action. The first of these, and the only one which is presently before the court, is for wages alleged to be due him, in the sum of $11,115. Walker contends that on or about June 9, 1947, at Baltimore, Maryland, he was employed by the owners of the vessel, whom he alleges to have been Rose L. Martin and Robert Morss Lovett, as second mate and supervisor of conversion, at wages of $585 per month, plus found, to assist in the outfitting and preparation of the vessel for a cruise to South America, and for such voyage. He alleges that notwithstanding that he performed all of his duties and was ready to complete the voyage, no part of his wages have been paid to him.

Walker claims a preferred maritime lien for the wages due him, and demands that he be paid by preference out of the proceeds of the sale of the said vessel before

all other persons except other wage claimants similarly situated.

In passing, it may be stated that as a part of his third cause of action, Walker claimed the sum of $2,600, alleged to have been advanced by him for the payment of a note due Maritime Salvage Equipment Corporation for funds advanced to pay crew's wages. This claim has since been abandoned.

Walter Krauss, Inc., on Jaunary 14, 1949, filed its intervening libel for an advance of $300, alleged to have been made by it to Rose L. Martin, for provisions and supplies, and wages due the crew.

Marine Management, Inc., on January 20, 1949, filed its intervention, alleging that it furnished, in October, 1948, materials to the vessel in the sum of $12.20, and on November 24, 1948, advanced to Rose L. Martin the sum of $100 for the purpose of paying crew's wages, or furnishing the crew with food.

In a separate proceeding bearing No. 1582 of the Admiralty docket of this court, Michael Gelland and others, on December 17, 1948, filed their libel in rem for wages due them as members of the Amiga Mia's crew. The court, on February 1, 1949, entered an order consolidating for trial the wage claims and claims for funds alleged to have been advanced for wages of the crew in the instant case with the libel of Michael Gelland and others, No. 1582 Admiralty.

The court, on February 16, 1949, on stipulation and joint motion of respective counsel for the original libellant, Woolsey, Michael Gelland and his co-libellants, Amore and Tosti, and another intervenor which subsequently withdrew its intervention, entered an order requiring the Clerk of Court to pay to Michael Gelland and his co-libellants sums aggregating $3,856.97 in full payment, discharge and satisfaction of their respective claims.

Counsel for Walker did not join in the motion and stipulation, but signified on a copy of the order that they made no objection thereto.

Hearing was in due course had on the wage claims and claims for the wage advances, at which time the claim of Marine Management, Inc. was not reached, and, as a consequence, that matter remains open.

This brings us to the consideration of the claims of Walker, Amore and Tosti.

The Amiga Mia, a former Coast Guard vessel, was purchased by Rose L. Martin, at Baltimore, Md., early in June, 1947, for the purpose of coversion into a yacht. Within a week after the purchase, Miss Martin employed Paul M. Walker to work on the vessel at wages of $475.00 per month, and $110.00 per month found. According to Walker, while the vessel was at Baltimore, his duties consisted of supervising conversion work on the vessel, and overseeing the vessel's crew, and that at that time he was mainly concerned with removing certain Navy equipment and gear from the vessel, and cooperating with the architect who had made a preliminary plan as to those things which had to be taken out in order for new equipment to be installed. He states that in connection with this work, he inspected the hull, woodwork and inside of the vessel, and claims that in addition to the supervision, inspection and other work which he did in connection with the conversion, he assisted members of the crew in scraping and painting the hull of the vessel. Walker testified that the number of men in the crew varied from time to time; that he picked out the men at the Union Hall, brought them to the owner, and that she did the hiring and fixed the wages. He states that while the vessel was at Baltimore, he did not at any time pay off the crew.

The vessel remained in Baltimore until some time in September, 1947, when it was towed to New York. There is some conflict in the testimony as to whether Walker was aboard the vessel during its trip from Baltimore to New York. Miss Martin testified that the towing company's employees and several seamen were aboard the vessel, and that she had sent Walker to New York to arrange for dock facilities in anticipation of the vessel's arrival there. Walker, on the other hand, claimed that he was on the vessel while it was being towed to New York, and that during the trip, he and the others aboard, when the weather was not

bad, did the ordinary work a seaman is required to do. I accept as correct his statement that he made the voyage. He was very vague, however, as to what work he did on the trip, and offered no explanation as to why he, the officer in charge, should have had to perform seamen's work.

When the vessel arrived in New York, it was taken to a shipyard known as Benjamin's, and subsequently to other yards. While it was in New York, Walker was the only officer aboard the vessel, was still in charge, and continued to supervise the conversion work. Walker testified that he and his men worked along with shipyard employees who were working on the vessel, and that there also he did some scraping and painting with the members of the crew. According to the testimony of Mrs. Martin —and at this point it is only proper to state that she gave every evidence of being, and in fact admitted being, very friendly to his cause,—Walker's duties while the vessel was undergoing conversion in New York, were supervisory, standing by to see, that the conversion work was properly done, and to inform Martin of any defects in the work.

After considerable work had been done on the vessel, Martin found herself without funds to pay the crew's wages and the various claims for work performed and material furnished. She thereupon applied to the United States District Court for the Eastern District of New York for relief under Chapter XI of the Bankruptcy Act, Section 322, 11 U.S.C.A. § 722. The Amiga Mia was virtually the only asset Martin had, and to enable her to settle the pending claims and thereby avoid a forced sale of the vessel, negotiations were entered into with Woolsey for the purpose of obtaining from him a loan in the sum of $18,000, to be secured by a first ship-mortgage on the vessel. The negotiations with Woolsey culminated in a written agreement between Woolsey, one Robert M. Lovett, Martin and Walker, dated June 23, 1948, in which Woolsey agreed to make the loan. Lovett, a friend of Woolsey's, had acquired an interest in the vessel from Martin, and Woolsey's willingness to make the loan is explained by a desire on his part to protect Lovett's investment. It was part of this agreement that upon the payment, discharge, or release of the creditors' claims application would be made under the Chapter XI proceedings for the termination and dismissal thereof, and that, thereupon, Walker would either transfer to Woolsey or cause to be cancelled, two mortgages held by the former on the vessel, each in the amount of $15,000, the second of which was recorded and listed in the bankruptcy proceedings. The purpose of such transfer or cancellation was to make possible the execution of the new first preferred mortgage in favor of Woolsey, as security for his loan, free from all liens and claims.

The mortgages held by Walker came into being under the following described circumstances. On October 15, 1947, at Baltimore, Martin executed a note to the order of Walker, payable July 20, 1948, in the sum of $15,000, which note bears the notation "Cash and services for ex-Coast Guard vessel 8302", the Amiga Mia. This note was secured by a chattel mortgage made the same date, on the Amiga Mia. On April 20, 1948, at New York, Martin gave Walker a first preferred mortgage on the Amiga Mia, securing the note of October 15, 1947. This mortgage was recorded in the office of the Collector of Customs, at New York, on the date that it was made.

On the same day that Walker's mortgage was recorded at the Custom House in New York, that is to say April 20, 1948, Martin enrolled the vessel at the Custom House in New York, and executed the requisite oath as owner. At the same time, Walker appeared there and took the oath as Master of the vessel. Walker would have it appear, by some parts of his testimony, that he did not understand the nature of the oath, that he did not read the document and merely signed it. In this, however, he is contradicted by other portions of his testimony, and by the fact that the oath itself contains information peculiarly within the knowledge of Walker, himself, which information could hardly have been known to the Deputy Commissioner of Customs unless it had been communicated to him by Walker.

By an assignment dated June 25, 1948, Walker assigned to Woolsey his entire claims against the Amiga Mia and Martin, including the secured claim of $15,000. Additionally, on June 28, 1948, by another assignment, Walker released any and all claims he had or might thereafter have against the Amiga Mia and Martin, for services theretofore rendered and services to be rendered to the date of the termination of the bankruptcy proceeding, and agreed that the application might be withdrawn and the proceeding terminated and dismissed.

After Woolsey agreed to make the loan, it was decided that Walker should call on the various creditors for the purpose of purchasing their respective claims with funds advanced by Woolsey, the idea being that Walker, as Captain of the vessel, would be able to purchase such claims at substantial reductions. Many of the claims were so purchased by Walker, and it is not disputed that Walker represented himself as Captain of the vessel in making such purchases.

By July 21, 1948, all claims against the vessel having been paid or provided for out of advances made by Woolsey, the bankruptcy proceeding was, on proper petition, dismissed. On the following day, July 22, 1948, Martin, in her own behalf and in behalf of Robert M. Lovett, signed a note payable to Woolsey in the sum of $18,000, and executed a first preferred mortgage on the vessel, in favor of Woolsey, to secure the note. A certified copy of the mortgage and of the notice to be posted in the pilot house of the mortgaged vessel were delivered to Walker, and it is significant that he receipted therefor as Master. In fact, the evidence is clear that throughout their dealings with Woolsey, both Martin and Walker held Walker out to Woolsey and to Woolsey's counsel to be the Captain of the Amiga Mia.

Intervening libellants, Alphonse T. Amore and Lucille B. Tosti, during the pertinent period, operated a bar and restaurant in New York City. Amore first met Walker when the latter had him cash a check of Martin's made payable to Walker. Walker had been in the establishment on several previous occasions, and was friendly with one of Amore's employees. At the time the check was cashed, Walker explained to Amore that Martin was the owner of the Amiga Mia, and that he, Walker, was Captain of the vessel.

Near the end of June, 1948 Walker visited Amore and Tosti and invited them to take a Sunday cruise on the vessel. Amore and Tosti accepted the invitation, and when they went aboard the vessel Walker introduced them to Martin. During the progress of the cruise, Martin informed her guests that she was planning to make a trip to South America; that she had been a writer for certain newspapers, and that on the prospective South American trip she intended to write stories concerning the trip and the places visited. On the Sunday cruise, which lasted some nine or ten hours, Walker was in command of the vessel. Subsequently, Amore and Tosti made two or three other such trips.

On July 21, 1948, after several other visits, Martin and Walker visited Amore and Tosti. During the conversation which ensued, Walker stated that he and Martin had a couple of ships in dry-dock in Baltimore. Martin explained that she was well-known in Washington, and produced a number of letters of recommendation from persons whom Amore and Tosti considered important. Martin again brought up the South American trip, and invited Tosti to go along. At this time, Martin and Walker stated that they were having trouble with the crew, growing out of failure to pay the wages of the crew for several months, and that the sum of $460.00 was needed for this purpose. Amore was reluctant to make the loan, but Martin assured him of its safety by stating that the loan would be secured by a lien on the vessel. Amore and Tosti made the advance of $460.00; and as additional security Martin gave them her check payable to cash for this amount, which check it was agreed should not be presented for payment until such time as Martin instructed them so to do.

On the following day, Martin and Walker returned. They represented that they were still having trouble with the crew, and needed $600.00 additional for crew's wages.

Walker, on this occasion, pointed out that this advance also would be secured by a lien on the vessel. The loan was made, and another check given by Martin, under the same arrangement as was the previous one. Walker, at this time, stated that he and Martin would soon sell the ships in dry-dock in Baltimore, the proceeds of which would enable them to repay the loans. Needless to say, there is no contention made here that Martin and Walker, or either of them, at the time owned any vessel other than the Amiga Mia.

On July 24, 1948, Martin and Walker came back to Amore and Tosti for another loan of $600.00, this time their explanation being that the funds were needed for crew's wages and also to pay certain bills for repairs and supplies. On this occasion, Walker, apparently as a further inducement for the making of the loan, stated that he owned a large ranch in Texas, from which he derived income. This advance of $600.00 was also made, and the evidence is that approximately $100.00 of it went to pay crew's wages, and the balance toward the payment of bills incurred for the vessel.

The next visit of Martin and Walker to Amore and Tosti was on July 25, 1948, when request was made for a further advance, this time in the sum of $4,400.00. Amore states that Martin and Walker promised that the funds with which to pay this and the advances previously made by Amore and Tosti would be waiting in New Orleans when the vessel reached that port on its proposed trip, and that upon arrival of the vessel in New Orleans, the funds would be forwarded to Amore and Tosti. What the source of such funds was to be was not explained by Amore. However, I think it is clearly to be inferred from the evidence, that it was the intention of Martin, Walker, Amore and Tosti, that the vessel be sold after its arrival at New Orleans. Amore testified that in view of the sizeable amount requested, he became wary and decided that he wanted something, as he put it, "on paper, as security against the ship." Walker then suggested that the parties go to his, Walker's, attorney. By arrangement, Martin, Walker, Amore and Tosti went to the attorney's

office on July 27, 1948. The attorney was out of the office, and, in his absence, Martin suggested that she write out the agreement between the parties, which she did. This agreement, written by Martin in her own handwriting, was signed by Martin, Tosti and Amore as parties, with Walker signing as a witness, and using the title "Captain". In this document, Martin agrees to "award" to Amore and Tosti, in consideration of $1660.00 already advanced, and $4,400.00 to be advanced, a 10% interest in the Amiga Mia, and in any eventual sale of the vessel at a price agreeable to all of the parties to the agreement. The additional advance of $4,400.00 was then made in cash, and approximately $3,400.00 of this amount was used to pay crew's wages.

After the handwritten agreement was signed, Martin expressed the view that copies should be made. Thereupon, she and the attorney's secretary went into the latter's office, and made what Martin stated to the others were exact copies of the original document. Martin, Tosti and Amore then signed the typewritten documents, with Walker again witnessing their signatures. Amore claims that he did not read the typewritten agreement, but that he and Tosti relied upon the word of Martin and Walker that the typewritten documents were exact copies of the original handwritten agreement. This I cannot believe. It is incredible that Amore, after demanding that the agreement be reduced to writing and putting himself to the trouble of going to a lawyer's office to have the writing prepared, should have been so little interested as not to have read the agreement before signing it.

While it is true that the transaction was an unusual one so far as Amore and Tosti were concerned, I cannot believe that they were ignorant of the provisions of the documents which they signed. Both Amore and Tosti are people of considerable business experience, this being particularly true of Amore. The agreements are very short and simple ones, and I must conclude that all parties to them were fully aware of their contents and import. That sale of the vessel was contem-

plated is borne out by Walker's testimony that he had an agreement with Martin that he was to be paid a bonus based on the sale price of the vessel, and by Amore's testimony that there had been discussion concerning the sale of the vessel and the price which might be expected to be realized. It seems clear to me, and I so find, that Amore and Tosti understood that they were receiving, and that they intended to receive, a 10% interest in the vessel, and in the proceeds of the sale thereof, in consideration of the monies which they advanced, amounting, at the time, to $6,060.00.

According to Amore, on each occasion that funds were advanced by him and Tosti, he witnessed the disbursement of such portions thereof as were used to pay crew's wages. Amore testified that of the $6,060.00 advanced, as described, $4,560.00 went to pay the crew. However, his testimony was not supported by receipts or vouchers, and the figure of $4,560.00 is an approximate one at best. No proof was offered to support the claim of Tosti that she advanced the sum of $1,700.00, part of which is alleged to have been employed to pay crew's wages.

On or about August 15, 1948, after having made a number of short trips in waters in the vicinity of New York City, the Amiga Mia left that port for New Orleans. Martin and Walker were aboard, and, at their invitation, so also were Amore and Tosti. Amore, because of his business, accompanied the party only as far as Atlantic City, N. J., whence he returned to New York by bus. Tosti remained on the vessel until it reached New Orleans.

From New York to Atlantic City, where Amore debarked, Walker was in charge of the vessel, was on the bridge deck, and charted the vessel's course. During this leg of the voyage, Walker wore a khaki uniform, and was addressed as Captain by the members of the crew and party.

Although Walker contends that he originally signed on at Baltimore as Second Officer, and there is great confusion as to what his contentions are as to whether he was ever at any time Captain of the vessel, it seems clear that at least until August

9, 1948, he did occupy that position. The log book, the vessel at that time lying at Sullivan's Shipyard, at Brooklyn, contains an entry, apparently made contemporaneously, to the effect that a change was on that date being made in command of the vessel; that Captain Arthur R. Murray was replacing Captain Paul Walker, and that Second Mate John J. Meyers was replacing Murray as Chief Mate. That Walker was Captain of the vessel is further established by a letter which he signed on April 6, 1948, reading as follows:

"April 6, 1948
To Whom It May Concern:
I, Paul Walker, Acting Captain of the yacht Amiga Mia, a registered United States vessel, Motor Screw #254,200, having acted in this capacity by agreement with the owner since September, 1947, hereby state: That I have no claims whatever against the vessel or proceeds of its sale, and that my agreement with the owner is a purely personal one which in no sense constitutes an obligation against the vessel itself.

Signed:
/s/ PAUL WALKER,
Paul Walker."

Before the vessel left New York on its cruise to New Orleans, the crew signed articles, and although Walker ostensibly signed on as Second Officer, the log book contains no entry from which it would appear that he stood any watch or performed any of the customary duties of Second Officer.

Martin gave as Walker's principal duties on the voyage, the checking of the equipment which had been installed, and the work performed in the shipyards. On cross-examination she stated that Walker took care of the radio equipment, checked breakdowns, and helped make repairs in the engine room. Why it should have been necessary for Walker to make engine room repairs when the vessel had an engine room crew, and Walker makes no pretense of engine room experience, has not been explained, nor does it seem likely that it could be. Walker, in his own behalf, in testifying concerning his duties on the voy-

age, was very vague. He, too, stated that his duties consisted mostly of supervising the equipment; that he checked the wiring; repaired some pumps, which work he claims the engineer did not know how to do; repaired the galley stove, and that the refrigeration was in trouble most of the time. However, this portion of his testimony was largely contradicted by him subsequently, when, in explaining how he was able to leave the vessel at Jacksonville, Florida, and come to New Orleans overland, he testified that he was, at the time, aware that any trouble which had been experienced, and the repairs made necessary thereby, had been of a minor nature. Walker left the vessel at Jacksonville and came to New Orleans, at the direction of Martin, to make arrangements for docking, do some personal errands for Martin, and to ascertain whether certain funds had arrived. He did not return to the vessel until it arrived here on August 26, 1948.

On August 24, 1948, before the vessel arrived here, Walker sent a telegram, which he signed "Captain Walker", to the intervenor Amore, requesting the sum of $120.00 to pay pilots' fees.

On November 7, 1948, from New Orleans, Walker sent to Woolsey a telegram as follows:

"My sincere thanks for the advance my receipt follows. Charter and financing going through if no more bickering between parties of ownership and those directly concerned in boat. My efforts on charter long hard work have asked nothing to date but must now consider myself please consider this boat can be put over if no further pressure is brought in anyway yearly charter should bring $30000 to $35000 these companies here have chartered boats for period of 2 1/2 to 5 years at six months at a time Respectfully

Capt Paul Walker

$30000    $35000    2 1/2    5"

After the vessel was libelled in New Orleans by Amore and Tosti, as a matter of economy it was agreed between Walker, counsel for Martin, and counsel for the libellants Amore and Tosti, that the vessel would be placed in the custody and control of a local shipyard, Dupuy's. The written agreement setting forth the conditions and terms on which the vessel was to be held at Dupuy's was signed by Walker as Master of the vessel.

The evidence concerning Walker's association with the vessel and its principal owner, Martin, has been discussed here in considerable detail for the reason that it eloquently speaks the fact that at all times the position occupied by Walker entirely transcended that of seaman, and that he never performed any duties aboard the vessel save those of Master. It abundantly establishes that Walker was an advisor, associate and co-adventurer of Martin in her undertaking of converting, refitting and selling the Amiga Mia.

*Conclusions of Law*
*The Walker Claim.*

That the Master has no lien on the vessel for his wages is well settled. The Orleans v. Phoebus, 1837, 11 Pet. 175, 36 U.S. 175, 9 L.Ed. 677; Burdine v. Walden, 5 Cir., 1937, 91 F.2d 321.

Intervening libellant Paul M. Walker performed no services on the Amiga Mia which would entitle him to a maritime lien, and is not entitled to be paid by preference.

The Amore-Tosti Claims.

One advancing money to pay off admiralty liens is entitled to a lien. The Owego, D.C.E.D.La.1923, 292 F. 403, 407, and cases there cited.

One in whose favor a lien exists may expressly or by his acts waive the lien. 1 Benedict, Admiralty, 274 (6th Ed., Knauth, 1940)

Amore and Tosti, by accepting a 10% interest in the Amiga Mia and in the proceeds of her anticipated sale, in consideration of the sums advanced by them, waived any lien which they may have had against the vessel, for such portion of said advances as was used to pay the crew's wages. They are not entitled to be paid by preference.

Judgment will be entered herein accordingly.